Frank Dickstein and Julius Katz v. Commissioner.
Dickstein v. Commissioner
Docket Nos. 51259, 51272.
United States Tax Court
T.C. Memo 1957-99; 1957 Tax Ct. Memo LEXIS 152; 16 T.C.M. (CCH) 403; T.C.M. (RIA) 57099; June 21, 1957
*152 1. Fraud. - Respondent failed to submit clear and convincing evidence that false and fraudulent returns for 1943 were filed. Held, the deficiencies for 1943 are barred. 2. Fraud. - Respondent established by cancelled checks cashed at check cashing concerns, paid invoices of customers, and records of check cashing concerns that gross receipts of petitioners' partnership were far in excess of gross receipts reported. He established that petitioners' cash expenditures for 1944 were substantially larger than reported income. Petitioners did not explain large discrepancies in receipts. Held, that false and fraudulent returns were filed for 1944, and part of each deficiency was due to fraud. 3. Burden of Proof. - Where unreported income was proved, respondent was aided by presumption that costs taken in return were all that existed, and petitioners had burden of proving that they had other costs which were not listed in return. Held, that petitioners had unreported costs, and an amount is approximated under Cohan rule in absence of proof of specific amounts. Julius Katz, 531 West 26th Street, New York, N. Y., pro se. Abraham L. Shapiro, Esq., Morris A. Kaplan, Esq., and Oscar Hanigsberg, *153 C.P.A., for petitioner. [1] William G. O'Neill, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the years 1943 and 1944, and additions to the deficiencies under section 293(b), 1939 Code, as follows: Docket No.
Petitioner
Year
Deficiency
Sec. 293(b)
51259
Frank Dickstein
1943
$ 3,516.15
$ 1,758.08
1944
23,943.32
11,971.66
Total
$27,459.47
$13,729.74
51272
Julius Katz
1943
$ 3,570.34
$ 1,785.17
1944
23,943.32
11,971.66
Total
$27,513.66
$13,756.83 The Commissioner has made claim, under section 272(e), for increases in the deficiencies and additions. Some of the determinations of the Commissioner are not contested. The questions for decision are: (1) Whether each petitioner understated his income for 1943 and 1944. (2) Whether each petitioner filed false or fraudulent returns for the taxable years so that assessment of deficiencies are not barred, section 276(a), 1939 Code, and whether all or part of each deficiency *154 was due to fraud with intent to evade tax. Findings of Fact Petitioner, Frank Dickstein, hereinafter referred to as Dickstein, was a resident of New York City in 1943 and 1944. Petitioner, Julius Katz, also known as Julie Katz, hereinafter referred to as Katz, was a resident of New York City. Petitioners timely filed income tax returns for the years 1943 and 1944 with the collector of internal revenue for the third district of New York. The returns were filed on or before March 15, 1944 and March 15, 1945. In 1943 and 1944, each petitioner was a member of a partnership, Modern Piece Dye Works, hereinafter referred to as Modern, in which each had a 50 per cent interest in the profits. Each petitioner reported income from Modern for 1943 and 1944 in the amounts of $3,988.12, and $4,360.62, respectively. Their returns for the taxable years showed no income other than income from the partnership. Modern filed partnership returns for 1943 and 1944 with the collector of internal revenue for the third district of New York. It reported its income for both years on an accrual basis. In its return for 1943, Modern's income, deductions, and net income were reported as follows: 1943
Gross Income
Gross receipts from business
$57,780.56
Less cost of goods sold: Inventory at beginning
of year
0
Merchandise bought
for sale
$35,294.35
Less inventory at end
of year
9,550.00
25,744.35
Gross profit from business
$32,036.21
Deductions
Salaries and wages
$13,132.24
Rent
2,056.41
Repairs
298.91
Taxes
553.21
Depreciation
506.88
Other deductions
7,512.31
24,059.96
Ordinary net income
$ 7,976.25
In *155 its return for 1944, Modern's income, deductions, and net income were reported as follows: 1944
Gross Income
Gross receipts from business
$78,910.56
Less cost of goods sold: Inventory at beginning
of year
$ 9,550.00
Merchandise bought
for sale
32,950.57
$42,500.57
Less inventory at end
of year
3,325.00
39,175.57
Gross profit from business
$39,734.99
Deductions
Salaries and wages
$17,407.89
Rent
1,542.00
Repairs
606.37
Taxes
710.08
Depreciation
455.64
Other deductions
10,291.77
31,013.75
Ordinary net income
$ 8,721.24 The Commissioner determined that the true net income of the partnership, Modern, for 1943 amounted to $28,436.55; that in the partnership return, net income was understated to the extent of $20,460.31; and that Dickstein failed to report in his return for 1943, and Katz failed to report in his return, income from the partnership in the amounts of $10,230.16, and $10,230.15, respectively. The Commissioner determined that the true net income of the partnership for 1944 amounted to $93,838.52; that in the partnership return, net income was understated to the extent of $85,117.28; and that Dickstein and Katz, each, failed to report income from the partnership in the amounts of $42,558.64, and $42,558.64, *156 respectively. Modern, the partnership, was organized in 1935. In 1943 and 1944, its place of business was located at 531 West 26th Street, New York City. Modern's business in 1943 and 1944 was primarily the dyeing and finishing of piece goods, laces, and metallic cloth. The business was operated by petitioners. Dickstein was a dyer and he was in charge of the dyeing operations, and he supervised the plant. Katz was the "outside" man, customer man, and salesman. The partnership was dissolved in 1945, at which time Dickstein ended his association with the business. Thereafter, Katz incorporated the business and he is still associated with the corporation which carries on the business formerly conducted as a partnership. At some time in 1949, the Internal Revenue Service discovered that Katz had been engaged in 1943 and 1944 in cashing checks at commercial check cashing agencies. Special agents of the Intelligence Unit of the Internal Revenue Service were then assigned the income tax returns of Modern, Dickstein, and Katz for 1943 and 1944 for investigation. The investigation began in 1949 and continued into 1950. In the course of a lengthy investigation, it was ascertained that at least *157 as many as 72 checks cashed by Katz at check cashing agencies were checks of customers of Modern. The special agents undertook to make thorough investigation of the entire business transactions of Modern during 1943 and 1944. The agents located a great many of Modern's customers who had dealings with Modern in 1943 and 1944. Some of the customers were located in the so-called garment center in New York City through a door-to-door inquiry. Others were located in Chicago and in cities other than New York. The agents endeavored to obtain the books of account and all accounting records of Modern, particularly those relating to 1943 and 1944, but were unable to obtain or locate such records. The agents called upon Dickstein and Katz to produce the accounting records, and upon Modern's accountant, without success. Dickstein advised the agents that having left the partnership and its business in 1945, he would have to ask Katz and the accountant to locate the accounting records. Modern's accountant in 1943 and 1944 was David S. Colin and he was available during the investigation. He testified at the trial of these cases. The agents, in 1949 or 1950, requested Colin's accountant's work papers *158 relating to Modern's accounts for 1943 and 1944, and they asked him for Modern's books. He did not produce the books, his work sheets, or any other accounting records of Modern for 1943 and 1944. Colin prepared the income tax returns of the partnership, Modern, for 1943 and 1944. The agents subpoenaed the accounting records of Modern for 1943 and 1944. The subpoena was delivered to Katz. The records were not produced. The respondent subpoenaed Modern's accounting records for 1943 and 1944 for production at the trial, of these cases. The records were not produced. The agents of respondent at no time could locate and examine the accounting records of Modern for 1943 and 1944. The primary objective of the investigation in 1949 and 1950 of the Commissioner's special agents was to determine whether Modern's income for 1943 and 1944 had been understated in the partnership returns and in the returns of Dickstein and Katz. The agents made a widespread investigation which included the investigation of records of check cashing agencies, the records of customers of Modern located by the agents, and Modern's bank account. It was necessary for the agents to search for Modern's customers because *159 the accounting and other records of Modern for the years 1943 and 1944 either were not available or were not made available. A circularization method was used by the agents to locate Modern's customers, and a large number of them were found who produced either their accounting records of their dealings with Modern in 1944, or some of their cancelled checks, or some of the original, paid invoices of Modern, or some of all types of records. The agents collected about 844 original invoices of Modern for its transactions in 1944, and customers' accounting records, such as ledger sheets, showing over 3,118 transactions. The agents obtained 170 cancelled checks made payable to Modern, made out in 1944, which were not cashed at check cashing agencies. During such investigation, the special agents developed information which they believed established that the income of Modern for 1943 and 1944 had not been fully reported in its partnership returns for those years. As a means of corroborating such indications of unreported income of the partnership and of the indications that petitioners had failed to report all of their income for 1943 and 1944, the special agents investigated the assets, *160 expenditures, bank accounts, and liabilities of each of the petitioners in 1944. The Commissioner's agents located more than 73 concerns who had made payments to Modern during 1944 who had retained records of their transactions with Modern such as cancelled checks, invoices, and accounting records. Other concerns were located who reported that they had been customers of Modern in 1943 and 1944 but had not retained records of transactions. The agents also examined the records of and obtained information from two check cashing concerns, Sixth Avenue Trading Corporation, relating to 1943 and 1944; and Greenhouse-Brandt, relating to 1944. From examination of the records of the check cashing agencies and of the records of customers of Modern, it was determined that some of the checks of customers of Modern, which were made payable to Modern, had been cashed at the check cashing agencies by Katz. Such checks of customers were in addition to customers' checks which presumably had been deposited in Modern's bank account in 1944. The check cashing agencies cashed checks for a fixed charge which never exceeded one-half of one per cent. For large checks, the charge might be reduced to one quarter *161 of one per cent. The agents obtained about 100 cancelled checks of customers of Modern, made out in 1944 and made payable to Modern, which Katz endorsed in the name of Modern, and cashed at the Sixth Avenue agency; and about 87 checks of customers, made out in 1944 and made payable to Modern, which Katz endorsed in the name of Modern and cashed at the Greenhouse-Brandt agency, or a total of about 187 checks. Modern used, in 1943 and 1944, a printed invoice bearing the following caption: " MODERN PIECE DYE WORKS, DYERS AND FINISHERS, PIECE GOODS, METALLICS AND LACES, 531 WEST 26th STREET, NEW YORK" The agents located, also, invoices in the hands of customers, made out in 1944, which purported to be from "J. Linder," and, also, "Jack Linder," and, also, "J. Stern" having as the address, "c/o Modern Piece Dye Wks, 531 W. 26th St., New York City," or "c/o Modern Dye" at the same address. Such invoices set forth descriptions of the numbers of yards of fabrics sold to the customer, and dyed, and the prices. The agents obtained from various concerns their cancelled checks made out in 1944 and one dated in 1945, made payable to either J. Linder, or Jack Linder, or J. Stern, or Jos. Stern. *162 Records of the two check cashing agencies showed that checks in these names which the agents had obtained, and others which the agents were unable to obtain, had been cashed at the check cashing agencies by Katz. The checks of customers made in 1944 to Linder or Stern, and invoices to customers in such names, are far less than checks of customers made in 1944 to Modern, and invoices of Modern. During 1943, Katz cashed checks at the Sixth Avenue check cashing agency. According to the records of that check cashing concern, the makers of the checks were the ordinary customers of Modern, such as are listed hereinafter. None of such cancelled checks and no invoices of Modern for which such cancelled checks were given in payment are in evidence. The total amount of the checks cashed by Katz at the Sixth Avenue check cashing agency during 1943 amounted to $20,460.31, and of this amount, checks totaling $8,783.29 were made payable to either Modern or Katz, and 13 checks totaling $11,677.02 were made payable to others. All of the 13 checks totaling $11,677.02 were made by Casino Novelty & Embroidery Co., except one for $100, payable to Budiansky, which was made by Muriel Co. Budiansky is known *163 also as Irving Budd. He is one of the partners of Casino Novelty & Embroidery Co. None of these 13 checks was made payable to J. Stern or J. Linder. These checks were made payable to the following: S. Plasticoff, S. Nelson, B. Star, D. Nusbaum, M. Beacon, S. Press, P. Finkel, S. Melnick, M. Rubin, Budiansky, and Sam Levine. Respondent increased Modern's taxable income for 1943 by $20,460.31, the amount of all of the checks cashed in 1943 at Sixth Avenue. Of all of the checks cashed by Katz during 1943 at Sixth Avenue, the 13 checks in the total amount of $11,677.02 were cashed for Irving Budd (Budiansky) and he received the proceeds. During 1944, Modern maintained a checking account at a branch of the Manufacturers Trust Company in New York City. The records of the bank of Modern's bank statements and for a large part of Modern's deposit slips for 1944 were in existence and available to respondent's agents when they were investigating the income of Modern for 1944. Modern's total deposits in its bank account during 1944 amounted to $80,985.88. The bank's retained deposit slips of Modern for 1944 show that deposits of checks amounted to $69,688.25, and of currency, $2,100.83. Records *164 were unavailable to explain whether the balance of the deposits, $9,196.80, consisted of either checks or cash. The summary of the above is as follows: 1944
Checks deposited
$69,688.25
Cash deposited
2,100.83
Nature of deposits unknown
9,196.80
Total 1944 deposits
$80,985.88
The records of the Sixth Avenue and of the Greenhouse-Brandt check cashing agencies show that during 1944 Katz cashed a large amount of checks made payable to Modern at each agency. There are in evidence most of the cancelled checks cashed by Greenhouse during 1944, and a large part of the checks cashed by Sixth Avenue, the total amounts of which are set forth below. All of such checks were made by the regular customers of Modern and, as has been stated above, they were made payable to Modern Piece Dye Works. For example, the checks were made by Samuel Chapman, Inc., Gladstone Fabrics, Pattulo Modes, Cotrell & Leonard (Albany), Philip Mangone, Atlantic Knitting Mills, Carmel Bros., Tilly Schanzer, Jacobson & Linde (Glenhunt), The Englander Company (Chicago), Anna Miller & Co., Zuckerman & Kraus, Inc., and many other regular customers. The amounts of the checks cashed during 1944 at the two check cashing agencies and the *165 amounts of the cancelled checks which are in evidence are as follows: Checks Payable to Modern-1944
Total Checks
Cancelled Checks
Checks Not
Agency
Cashed Per Records
in Evidence
Available
6th Avenue
$48,005.02 *
$22,770.16
$25,234.86
G-B.
17,830.58 **
17,529.50
301.08
$65,835.60
$40,299.66
$25,535.94 There are in evidence files containing a great many of the paid original invoices of Modern sent to its various customers during 1944. These invoices show the total charges to such customers in 1944 in the total amount of $95,896.35. Some of these files contain cancelled checks of the customers given in payment of the invoices. Such checks were not cashed at any check cashing agency and are not included in the above schedule. Since this group of cancelled checks is incomplete, i.e., does not provide a check in payment of every invoice of Modern, the total amount thereof is not set forth. The following schedule is a summary of all of the customer's files which are in evidence. It represents verified transactions of Modern in 1944 which were carried on in the name of *166 Modern; it shows the customers, their addresses, and the total amounts of the transactions of each with Modern: Name of Customer
City
Amount
Hollander Lace Corp.
New York City
$ 5.25
Vergara Conti, Inc.
Larchmont, N. Y.
26.25
Netti Rosenstein, Inc.
New York City
288.29
Rosebrooke, Inc.
New York City
466.60
Linker & Herbert, Inc.
New York City
33.60
General Sewing Corp.
New York City
36.25
Emily W. Ellis, Inc.
New York City
26.00
Well Knit Novelty Corp.
New York City
4.86
May Levine & Co.
New York City
262.40
Parnis Levinson, Inc.
New York City
8.50
Imperial Flower Co.
New York City
153.08
Townley Frocks, Inc.
New York City
41.72
Hilldale Sportswear
New York City
138.50
Baer Bros.
New York City
337.75
Ira-Rentner-Miller & Co.
New York City
117.73
Trigere
New York City
1,164.18
Mill End Shops
New York City
766.70
Gladstone Fabrics
New York City
4,315.99
Philip Mangone Co., Inc.
New York City
1,974.83
C.H.D. Robbins Co.
New York City
1,108.05
Radiant Dress Co., Inc.
New York City
262.24
Mayer & Fisher, Inc.
New York City
88.20
Ben Gershel & Co., Inc.
New York City
1,669.43
Lyttle Bros.
New York City
477.40
Tilly Schanzer, Inc.
New York City
3,189.58
Pattulo Modes, Inc.
New York City
3,412.16
Farguharson & Wheelock
New York City
242.75
Seco Leather Products Co.
West N. Y., N.J.
639.60
Checker Fabrics & Net Co.
New York City
101.90
Rosen & Tenny, Inc.
New York City
60.99
N. Y. Deb, Inc.
New York City
126.00
Sperry Gyroscope Co.
Long Island, N. Y.
37.50
Nat Arnold, Inc.
New York City
596.93
Geiger & Spector, Inc.
New York City
245.73
Atlantic Knitting Mills Co.
New York City
7,087.78
Fred A. Block, Inc.
Chicago, Ill.
119.14
Blumenstein Co.
New York City
2,456.70
Mathews Kadetsky Co.
Boston, Mass.
892.46
Harry Frechtel & Co.
New York City
7,712.40
Star Dyeing Co.
New York City
3,609.72
Andre Proteau, Inc.
New York City
472.61
Harry Roher, Inc.
New York City
$ 609.81
Anna Duke Co.
New York City
295.10
Landmark Dress Co., Inc.
New York City
539.77
Louise Barnes Gallagher, Inc.
New York City
1,281.35
Original Modes Co.
New York City
1,261.44
Herbert Meyer, Inc.
New York City
915.04
Anna Miller & Co.
New York City
1,500.41
Maurice Rentner & Co.
New York City
966.20
Jacobson & Linde, Inc.
New York City
445.15
Hannah Troy, Inc.
New York City
2,191.08
Bretton Dress Corp.
New York City
987.50
Zuckerman & Kraus, Inc.
New York City
4,166.62
Kaplan & Grabois, Inc.
New York City
603.39
Sol Horowitz Dress Corp.
New York City
262.18
Jamison Classics, Inc.
New York City
54.29
Levy Blum & Goldschmidt Corp.
New York City
574.35
DeMartin Embroidery Co.
West N. Y., N.J.
308.54
Ellen Lace Corp.
New York City
1.50
Sosnow & Kranz, Inc.
New York City
16.40
Wishnack-Albert
New York City
1,531.33
Herbert Sondheim, Inc.
New York City
304.48
Samuel Chapman, Inc.
New York City
14,408.08
Silplan Textile Co.
New York City
138.40
William Bass Dress Co.
New York City
1,613.70
Deitsch, Wersba & Coppola
New York City
1,229.76
Carmel Bros.
New York City
780.50
Weinberg-Weinberg-Alpern
New York City
924.70
Bienard-Greene Co.
New York City
249.01
Cotrell & Leonard, Inc.
Albany, N. Y.
4,084.28
Jack Weiner Associates, Inc.
New York City
414.85
Adler & Adler, Inc.
New York City
4,756.20
Colby Classics, Inc.
Boston, Mass.
2,341.95
The Englander Co., Inc.
Chicago, Ill.
1,361.14
$95,896.35
*167 Samuel Chapman, Inc., was located at 530 Seventh Ave., New York City, in 1943 and 1944. Harry Margulis was employed by the Chapman corporation in those years as a buyer of piece goods and in production operations. In 1943 and 1944 it was difficult to obtain piece goods, at least at certain times. Chapman had business transactions with Modern in 1943 and 1944. These transactions involved two types. Chapman would send its own pieces of materials to Modern to be dyed. Also, Chapman purchased materials from Modern and had such materials dyed by Modern. Margulis usually dealt with Katz when he purchased piece goods from Modern, but when fabrics were scarce he also dealt with Dickstein. Examples of purchases of materials from Modern are established by invoices of Modern dated February 17, 1944, March 17, 1944, March 24, 1944, and May 5, 1944. Such invoices are the regular printed statements which were used by Modern in the regular course of its business and on them there are no references to J. Linder or J. Stern. On February 17, 1944, Modern charged Chapman $975.20 for a total of 1,219 yards of crepe, "dyed and sold", at 80 cents per yard. The bill was for five pieces of crepe, one piece *168 being 265 yards, and others being 299 yards, 220 yards, 180 yards, and 255 yards. Each piece was dyed a different color. Chapman paid for these fabrics on March 1, 1944 under its check for $975.20 made payable to Modern. This check was cashed by Katz at the Sixth Avenue check cashing agency. On March 17, 1944, Modern charged Chapman $274.79 for 323 yards of fabric "dyed and sold", which comprised four pieces measuring 85 yards, 85 yards, 77 yards, and 76 yards. On March 24, 1944, Modern charged Chapman $271.48 for four pieces of goods measuring, each, a little more than 88 yards, 61 yards, 84 yards, and 85 yards, or a total of 319 1/3 yards, "dyed and sold". On May 5, 1944, Modern charged Chapman $691.05 for 10 pieces of novelty crepe, "dyed and sold", measuring more than 60 yards, each, or a total of 813 yards. The Commissioner's agents ascertained from the records of Samuel Chapman, Inc., that it paid Modern $14,408.08 during 1944. The agents ascertained from the records of the Sixth Avenue check cashing agency that during 1944, Katz cashed checks there of Chapman, Inc., in the total amount of $5,844.31, of which Chapman, Inc., was able to give the agents four of its cancelled checks *169 made payable to Modern and endorsed by Katz which were cleared through a bank with which the Sixth Avenue check cashing agency had its account. The four checks (including the check for $975.20 mentioned above) were for the total amount of $3,473.70. Katz admits that Margulis told him in 1944 that Chapman needed to buy piece goods and that Margulis purchased piece goods which Katz obtained for him. Jacobson & Linde, Inc., in 1944, carried on a business in New York City of manufacturing ladies' suits and coats. It used the trade name, Glenhunt, on some of its checks. Joseph Feldman was employed by this company in 1944 as a buyer of piece goods. Glenhunt had business transactions with Modern which included having piece goods dyed by Modern. According to the invoices of Modern for 1944 which were retained by Jacobson & Linde, and other records of Jacobson and Linde, that concern paid Modern $445.15 during 1944. According to the records of the Sixth Avenue check cashing agency, a check of Glenhunt made payable to Modern in the amount of $80.50 was cashed by Sixth Avenue on March 8, 1944. The check was endorsed by Katz in the name of Modern, both names appearing in the endorsement. Another *170 check of Glenhunt for $15.60, and a check of Jacobson & Linde for $57.75 were cashed in 1944 at the Sixth Avenue agency. Both checks were payable to Modern and were endorsed by Modern by Katz. There are in evidence three checks of Glenhunt which were cashed by the Greenhouse-Brandt check cashing agency, all of which are made payable to Modern, and which were endorsed in the name of Modern by Katz. The dates and amounts of those checks are as follows: June 7, 1944, $67.20; July 13, 1944, $91; September 8, 1944, $34.65. Feldman bought piece goods in 1944, on two occasions, from Modern under arrangements he made with Katz. The invoices were from J. Linder and Jack Linder, c/o Modern Dye, 531 West 26th Street, and checks of Glenhunt in payment of the invoices were made payable to J. Linder and to Jack Linder, as is set forth below. Feldman did not know, and does not know, any person, or persons, named either J. Linder or Jack Linder. He assumed that the names J. Linder and Jack Linder applied to one and the same person and that he was a member of the Modern firm. He understood that the piece goods were being purchased from Modern. He did not understand that the name Linder was a fictitious *171 name. He testified as follows: "I know Julie Katz sold merchandise through Modern Piece Dye Works." An invoice dated February 16, 1944 in the name of "J. Linder c/o Modern Dye, 531 W. 26 St." was sent to Jacobson & Linde for over 333 yards of crepe, and for over 419 yards, or a total of 753 yards, "dyed and sold", in the amount of $677.70. A check of Glenhunt, dated February 17, 1944, in the amount of $677.70, payable to J. Linder, was given in payment for the invoice. It is endorsed, "Jack Linder". This check was cashed at the Sixth Avenue check cashing agency on February 18, 1944, and according to the records of Sixth Avenue, it was cashed by Katz. An invoice dated February 9, 1944, in the name of "Jack Linder c/o Modern Dye, 531 W. 26" was sent to Jacobson & Linde for over 699 yards of crepe "dyed and sold", in the amount of $629.55. A check of Glenhunt, dated February 11, 1944, in the amount of $629.55, payable to Jack Linder, was given in payment of the invoice. The check is endorsed, "Jack Linder". This check was cashed at the Sixth Avenue check cashing agency on February 15, 1944. According to the records of Sixth Avenue, it was cashed by Katz. Harry Frechtel & Company, located *172 in New York City, was a customer of Modern in 1943 and 1944 to which it ordinarily sent piece goods to be dyed. Morris Seifer, who has been an employee of the Frechtel Company for over 25 years, was employed by that Company in 1943 and 1944 as a piece goods man, and he bought crepe linings for garments. In 1944, when materials for linings were scarce, Frechtel Company purchased piece goods, on several occasions set forth below, under arrangements made with Katz and Modern whereby the piece goods so purchased were dyed by Modern. The Frechtel Company drew its check dated February 21, 1944, payable to J. Linder, in the amount of $1,497.57, in payment of an invoice bearing the following: "J. Linder c/o Modern Piece Dye Works," and dated February 21, 1944, on which were listed three charges to Frechtel Company, namely, February 16, $287.22; February 17, $488.47; and February 18, $721.88. The charges were for, respectively, 328 1/2 yards of crepe, 558 1/2 yards of crepe, and 825 yards of crepe. Seifer initialed the separate invoices designating the receipt of each purchase of crepe. Two of the invoices were marked in handwriting, "crepe sold." On all of the invoices the purchase price is *173 stated to be 87 1/2 cents per yard. Katz and Modern obtained the yardage above described for Frechtel Company. Frechtel Company drew its check dated March 2, 1944, payable to J. Linder, in the amount of $1,945.45, in payment for an invoice bearing the following: "J. Linder c/o Modern Piece Dye Works, 531 West 26th St., New York, N. Y.," and dated March 2, 1944, on which were listed four charges to Frechtel Company, namely, February 21, $442.31; February 23, $328.89; February 24, $602.44; and February 25, $571.81. The charges were for, respectively, 505 1/4 yards of crepe "sold" for 87 1/2 cents a yard; 375 yards of crepe "dyed and sold" for 87 1/2 cents a yard; 688 yards of crepe "dyed and sold" for 87 1/2 cents a yard; and 653 1/4 yards of crepe "dyed and sold" for 87 1/2 cents a yard. All of the several invoices were initialed by Seifer signifying the receipt of each purchase of crepe. Frechtel Company drew its check dated March 14, 1944, payable to J. Linder, in the amount of $651.89, in payment of an invoice bearing the following: " J. Linder, Modern Piece Dye Works, 531 West 26 St., New York, N. Y.", and dated March 14, 1944, on which were listed three charges to Frechtel Company, *174 namely, February 28, $287.44; February 29, $146.13; and March 6, $218.32. The charges were for, respectively, 328 yards of crepe at 87 1/2 cents per yard; 167 yards of crepe "dyed and sold" at 87 1/2 cents per yard; and 249 yards of crepe "dyed and sold" at 87 1/2 cents yer yard. All of the invoices were initialed by Seifer signifying the receipt of each purchase of crepe. The three checks of Frechtel Company described above were cashed at the Sixth Avenue Trading Corporation check cashing agency. When materials for linings were scarce in 1944, Frechtel Company bought linings from Katz. Katz billed Frechtel for the linings under the name of J. Linder. On October 24, 1944, an invoice was sent to Harry Roher & Co., New York City, under the name, "J. Stern (531 W 26 St) c/o Modern Dye", for 103 yards of crepe at 80 cents a yard charging Roher $82.80. Roher issued its check on November 10, 1944, payable to J. Stern, in the amount of $82.80. This check was cashed by Katz at the Greenhouse check cashing agency. The following schedule summarizes the transactions in the name of either J. Linder or J. Stern for which the respondent obtained invoices: Name of
Total
Customer
"Seller"
Amount
J. Roher
J. Stern
$ 82.80
Jacobson & Linde
J. Linder
1,307.25
Harry Frechtel Co.
J. Linder
4,094.91
$5,484.96
The *175 following schedule shows the cancelled checks of customers obtained by the respondent, which were made payable to J. Stern, and the names of the check cashing agencies where they were cashed by Katz: Payable to
Check Cash-
Customer's Checks
J. Stern
ing Agency
Mary Lee, Inc.
$2,069.78
Greenhouse
Mary Lee, Inc.
4,164.31
6th Avenue
Kabat Fabrics
415.18
Greenhouse
Harry Roher, Inc.
761.38
Greenhouse
Harry Roher, Inc.
857.36
Greenhouse
Harry Roher, Inc.
82.80
Greenhouse
$8,350.81
The following schedule shows the cancelled checks of customers made in 1944, obtained by the respondent, which were made payable to J. Linder, and the names of the check cashing agencies where they were cashed by Katz: Payable to
Check Cashing
Customer's Checks
J. Linder
Agency
Harry Frechtel Co.
$1,945.45
6th Avenue
Harry Frechtel Co.
1,497.57
6th Avenue
Harry Frechtel Co.
651.89
6th Avenue
Harry Roher, Inc.
831.51
6th Avenue
Jacobson & Linde
629.55
6th Avenue
Jacobson & Linde
677.70
6th Avenue
$6,233.67 The respondent obtained checks made to J. Stern and to J. Linder which Katz cashed at the two check cashing agencies in the total amount of $14,584.48, [2] *176 as follows: Cashed at Sixth Avenue
$10,397.98
Cashed at Greenhouse
4,186.50
$14,584.48
The records of the Sixth Avenue check cashing agency show that during 1944 Katz cashed checks made to J. Stern and to J. Linder in the total amount of $14,109.44, some of which were obtained by the respondent as is shown above. The records of Greenhouse show that during 1944 Katz cashed checks made to J. Stern in the total amount of $4,186.50, all of which were obtained by the respondent as is shown above. The total amount of such checks is $18,295.94. Modern's gross receipts during 1944 from checks deposited in its bank account at the Manufacturers *177 Trust Company and from checks in its name (excluding checks in the names of Stern and Linder) which were cashed by Katz at the two check cashing agencies, according to their records, amounted to $135,523.85, as the following shows: Mfrs. Trust Co. deposits of checks
$ 69,688.25
Check cashing agencies' records
65,835.60
$135,523.85
At a conference with respondent's agents on September 8, 1950, petitioners were asked to submit a net worth statement for 1944. Both refused. Because of the refusal, the agents investigated the cash expenditures of each petitioner during 1944. It has been stipulated by Dickstein and respondent, as follows: On January 1, 1944, Dickstein's savings account at the Manufacturers Trust Company had a balance of $6,451. On December 31, 1944, the balance was $90. On January 1, 1944, Dickstein's checking account at the Manufacturers Trust Company had a balance of $520. On December 31, 1944, the balance was $203. During the year 1944, Dickstein purchased U.S. Government bonds at a cost of $3,700, which bonds were paid for by check. During the year 1944, Dickstein purchased real estate (a residence) in Peekskill, New York, at a cost, over the mortgage, of $8,033.78, which *178 was paid by check. During the year 1944, Dickstein expended the sum of $5,580.28 for rent, food, clothing, insurance premiums, payment of taxes, and miscellaneous items. During the year 1944, Dickstein loaned the sum of $25,300 to the Creston Avenue Corporation. In 1944, Dickstein invested $250 in a corporation, Sidley Holding Co., and he made a loan of $9,750 to the same corporation. In his individual income tax return for 1944, Dickstein reported gross income in the amount of $4,360.62, and net income in the amount of $596.13. During 1944, Dickstein was a married person and he had one child. During 1944, Dickstein made cash expenditures of $52,614.06, as follows: Investments in 2 real estate corpora-
tions
$35,050.00
Cash invested in residence
8,033.78
Purchases of Government bonds, cost
3,700.00
Purchase of stock
250.00
Living expenditures
5,580.28
$52,614.06 Sources of some of his expenditures were as follows: Withdrawals from checking account, $317; withdrawals from savings account, $6,361; total, $6,678. Dickstein's unexplained cash on hand during 1944 amounted to $41,575.44, as follows: Total cash expenditures
$52,614.06
Less: Cash from banks
$6,678.00
Cash per return
4,360.62
11,038.62
$41,575.44
During *179 1943 and 1944, Dickstein was not indebted to others for borrowed funds or other kinds of indebtedness. In 1940, Dickstein reported to the Selective Service that neither he nor any of his dependents owned any property, the value of which exceeded $500. In subsequent years, he informed the Selective Service that for the year 1940, he had earned $50 per week and had spent $3,500 for furniture and living costs; that for the year 1942 he had earned $3,000; that for the year 1943, he had earned $3,500; and that in 1943 he had given $250 to his mother. In his return for 1944, Katz reported gross income of $4,360.62, and net income of $596.13. Katz was a married person in 1944, and he had one child. During 1944, Katz expended $5,937.80 for prepaid insurance premiums; he purchased U. S. Government bonds at a cost of $5,100; his estimated living expenses amounted to $6,284.69; and the increase in balances in bank accounts in either his name, or his wife's name, or in their joint names, amounted to $12,226.77. Accordingly, his available cash amounted to $29,549.26. Subtracting from this amount the gross amount which he reported in his income tax return for 1944, $4,360.62, Katz's unexplained *180 cash on hand during 1944 amounted to $25,188.64. During 1943 and 1944, Katz was not indebted to others for borrowed funds or other kinds of indebtedness. Katz borrowed $525 from the Manufacturers Trust Company on October 7, 1940, to cover personal expenses, and $420 from the same bank in July 1942, for summer vacation expenses for his wife and child. In 1942, Katz reported to the Selective Service that his average earnings were $50 per week; that his wife earned $15 per week; and that his mother-in-law and father-in-law were unemployed. Modern did not sell any of its equipment or machinery during 1943 and 1944. The statutory notices of deficiency were mailed to each petitioner on August 17, 1953. Neither one of the petitioners executed a waiver extending the time for the assessment of tax for 1943 and 1944. The total face amount of checks cashed by Katz during 1944 at the two check cashing concerns amounted to $84,131.54, [3] *181 as follows: Checks payable to Modern
$65,835.60
Checks payable to S. & L.
18,295.94
$84,131.54
The Commissioner determined that Modern's gross receipts for 1944 amounted to $164,027.84. [4] *182 The Commissioner accepted as correct the amount stated in the return of the partnership as the "cost of goods sold," $39,175.57. He did not allow the partnership any amount for additional costs of materials during 1944. The Commissioner accepted as correct deductions for various expenses taken in the partnership return in the amount of $31,013.75. Allowing costs and expenses in the total sum of $70,189.32, the Commissioner determined that Modern's net income for 1944 amounted to $93,838.52. Since the partnership reported in its return net income of $8,721.24, respondent determined that Modern's net income was understated to the extent of $85,117.28. The names, "Joseph Stern," "J. Stern," "Jack Linder," and "J. Linder" were fictitious names used by Katz in transactions involving Modern's business, from which Modern derived income during 1944. All of the proceeds of all of the checks cashed at the check cashing concerns during 1944 were turned over to Modern by Katz, and none was [were] retained by him. A reasonable allowance for the total charges of the check cashing concerns for cashing all of the checks in the total face amount of $84,131.54 is their ordinary charge of one and one-half per cent, or $1,261.97. The net proceeds of all of the checks cashed at check cashing concerns were $82,869.57. Modern had costs of goods sold in 1944 in the amount of $25,000, which are in addition to cost of goods sold taken in its return in the amount of $39,175.57. Modern's gross receipts for 1944 amounted to $163,042.10, and its taxable net income amounted to $66,590.81, of which $8,721.24 was reported by petitioners. Modern's taxable net income was not reported to the extent of $57,869.57. Dickstein and Katz did not file false and fraudulent *183 returns for 1943. The deficiencies for 1943 are barred. Dickstein and Katz, each, filed false and fraudulent returns for 1944. Part of the deficiency in the income tax liability of each petitioner for 1944 was due to fraud with intent to evade tax. The stipulated facts are found as stipulated. Opinion HARRON, Judge: The first question is whether petitioners filed false or fraudulent returns for 1943 within the provisions of section 276(a), 1939 Code, so that the bar of the statute of limitations against the assessment and collection of deficiencies and additions thereto is removed. The respondent has the burden of proof under this issue. Section 1112. It is concluded that respondent's evidence fails to establish that false or fraudulent returns were filed for 1943. It follows that the deficiencies and additions for 1943 are barred. The findings of fact relating to 1943 dispose of this question but these observations are made: Whether petitioners filed false or fraudulent returns for 1943 depends upon whether they failed to report in their returns all of their distributive shares of the actual net income of Modern for 1943. Respondent's proof is limited to records of Sixth Avenue check *184 cashing agency which show that during 1943 Katz cashed checks payable to Modern and himself in the total amount of $8,783.29, and 13 other checks payable to various individuals, in the total amount of $11,677.02. Respondent determined that the total amount of all of the checks, $20,460.31, constituted unreported income of the partnership, Modern. He did not differentiate between the checks payable to Modern and Katz, and those payable to various individuals other than Katz. We conclude that such distinction must be made and that the evidence does not establish that the proceeds of the checks to the other individuals were retained by either Katz or Modern. Eliminating the group of 13 checks, the question is whether Modern failed to report the proceeds of the checks totaling $8,783.29. In the 1943 partnership return filed for Modern, gross receipts in the amount of $57,780.56 were reported. Respondent was unable to prove that such amount did not include $8,783.29. With respect to the checks totaling $11,677.02, there is testimony of Irving Budd, also known as Budiansky, a partner in Casino Novelty & Embroidery Co. in New York City, that all of these checks were cashed by Katz for Budd *185 and that Budd received all of the proceeds. Casino was engaged in the embroidery business. Budd testified that all of the checks of Casino were payable to persons to whom Casino owed money, and that he was not established with a check cashing agency so that he could cash these checks for the payees. Budd's testimony stands unrefuted and unimpeached. Respondent introduced no evidence relating to this group of checks which clearly connects them with any transactions of or for Modern, and he introduced no evidence from which it can be found that Katz received and kept the proceeds of these checks. Respondent relies greatly upon inferences and suspicion with respect to these checks. On brief, his argument deals only slightly with the year 1943. We are unable to conclude that the income of Modern or of either one of the petitioners for 1943 was understated in the returns to the extent of $11,677.02. The next question is whether false and fraudulent returns were filed for 1944. The respondent contends that petitioners, through Modern, realized a substantial amount of income which they failed to report, and that this, coupled with the alleged concealment of the receipt of income through *186 resorting to the procedure of cashing a large amount of checks at check cashing concerns and the use of the fictitious names of Stern and Linder, establish that petitioners filed false and fraudulent returns for 1944. Respondent has made 50 per cent additions to the deficiencies for 1944 under section 293(b). He has the burden of proving that all or part of each deficiency is due to fraud with intent to evade tax, as well as the burden of proving that false and fraudulent returns were filed for 1944. Each petitioner denies that he filed a false and fraudulent return and both contend that all of Modern's income for 1944 was reported in the partnership and individual returns. They deny that Modern sold fabrics of any kind and contend that most, if not all, of the checks cashed at the check cashing concerns involved accommodations to customers who purchased fabrics from unnamed vendors who received all or most of the proceeds of such checks in payment for their merchandise and that Modern received from the proceeds only charges for dyeing the materials plus a bonus for its accommodations. Katz denies that he used the names Stern and Linder; he contends that the unnamed individuals who *187 had goods to sell adopted those names of their own accord. Dickstein denies all participation in any transaction in which the sale of fabrics was involved; he denies receiving any income therefrom, and he argues that if it is held that Katz realized income from any of the transactions, all was Katz's income and is taxable to him. Petitioners contend, further, in the alternative, that even if it is assumed that Modern, or either of them, received the entire proceeds of all checks cashed at check cashing concerns, such as the sum of $85,117.28, there must be allowance for costs relating to such receipts; that the costs in the amount of $39,175.57 set forth in the partnership's return have no relationship to the alleged receipts of $85,117.28; and that respondent's addition of $85,117.28 to the taxable net income of Modern is in error because he did not allow any additional deduction for additional costs. On brief, it is pointed out by petitioner, Dickstein, that respondent's determination that gross profit amounted to $124,852.27, and that cost of goods sold amounted to only $39,175.57, results in a gross profit of 76 per cent which, it is argued, is a much higher percentage of profit *188 than was or could have been realized. The respective contentions of the petitioners are discussed hereinafter. Our first consideration is whether respondent's proof discharged his burden of showing that false or fraudulent returns were filed for 1944 by each petitioner. In meeting his burden of proof, respondent is required to establish that each petitioner omitted a substantial amount of income from his return; it is not required that respondent prove the precise amounts of unreported taxable income realized by each petitioner. ; , certiorari denied ; ; ; . The respondent introduced evidence which he claims shows that by use of a method which disclosed unexplained expenditures and unexplained increases in bank balances in 1944 of each petitioner, Dickstein's income amounted to about $45,936, of which he reported only $4,360.62; and Katz's income amounted to about $29,549, of which he reported only $4,360.62. Respondent resorted to this method of finding out whether each *189 petitioner had unreported income for 1944 after each petitioner refused to give respondent's agents net worth statements, and after the agents had discovered that check cashing activities in the name of Modern involved more than $65,000, which was unaccounted for by Modern's bank deposits of cash, and its partnership return, and for which no accounting records were available or produced. There was a gross discrepancy between Modern's bank deposits of cash and its gross receipts which was indicated by the records of check cashing agencies, for which petitioners did not provide any adequate explanation, supported by external proof. Under all of the circumstances and in the absence of business or personal accounting records, respondent was justified in resorting to the cash expenditures method and the method he used of circularizing customers for ascertaining the income of each petitioner. . Upon the trial of these cases, and against the background of respondent's voluminous evidence, each of petitioners introduced very little evidence to account for the unexplained available cash which each had in 1944. Each of petitioners failed to prove that the *190 available cash used for expenditures in 1944, and the increases in their bank deposits, came from nontaxable sources, loans, or accumulated earnings of prior years. Dickstein did not deny that he had made cash expenditures in the amount of about $45,936 in 1944, and he did not claim that he had cash on hand at the beginning of 1944. He attempted to explain the source of some of his expenditures by calling a witness, Jagoda, to testify that he had made loans to Dickstein, but Jagoda's testimony was not helpful to Dickstein. He also contends that he made large withdrawals from capital of the partnership. Dickstein did not produce checks, notes, or any other proof to corroborate his claim that he had borrowed money. Respondent introduced evidence which contradicted some of Dickstein's testimony. With respect to Dickstein's claim that he made large withdrawals from his capital in Modern, there is no corroboration. There is no proof that Modern sold pieces of equipment in 1944 which produced a source of funds for petitioner's use. Modern's accountant could not establish the dates or amounts of Dickstein's alleged withdrawals, or the manner thereof. Bank records showed no substantial withdrawals *191 from Modern's bank account. Katz did not claim that he had cash on hand at the beginning of 1944 and he did not deny that he had made cash expenditures during 1944 in the amount of about $29,549. He contended that the increases in his assets were the result of borrowing and a gift from his father-in-law, but he did not produce evidence of the alleged loans or gift; and he was not clear as to who had loaned money to him, when the alleged loans were made, or what form they took. We are unable to accept Katz's uncorroborated testimony that he received a gift and loans in 1944. Respondent determined that Dickstein had taxable income, his share of Modern's earnings, which he failed to report in the amount of $42,558.64. Respondent's evidence about his cash expenditures shows that, exclusive of the income which he reported in his return, he had cash in the amount of $41,575.44, the source of which he failed satisfactorily to explain. The closeness of these figures serves to establish clearly and convincingly that Dickstein failed to report all of his income for 1944. Although respondent's evidence about the cash expenditures of Katz produced a smaller figure, $25,188.64, the source of which *192 Katz failed to explain, such evidence serves to establish clearly, also, that Katz failed to report all of his income for 1944. Respondent's evidence about the large amount of funds involved in the check cashing activities during 1944, $84,131.54, provides proof of a source of petitioners' unreported income. Petitioners' contention that a very small percentage of the above amount was received by Modern was not proved by them and some of their explanations are neither convincing nor substantiated. It is necessary to make observations about this part of the evidence. Katz gave the following explanation of the practice of cashing checks during 1944 at check cashing concerns. He testified that during 1944 materials for linings, such as crepes, and for other purposes were scarce and that from time to time manufacturers, who sent piece goods to Modern to dye, indicated that they would buy fabrics if Katz, Modern's outside man, could obtain any, but they did not want to have any financial dealings directly with any vendors of such goods and, as an accommodation, desired invoices for such materials from Modern. Katz explained that the reason for the request to receive invoices from Modern *193 was that there were no O.P.A. ceiling prices on dyeing charges whereas there were O.P.A. ceilings on the selling prices of fabrics. A practice was followed, therefore, according to Katz of sending invoices to such customers of Modern marked "dyed and sold" on which the prices per yard stated were a combined figure to cover the cost per yard of fabrics purchased by a manufacturer and the charge per yard for dyeing the same fabric. For example, a price of 87 1/2 cents per yard might represent 62 1/2 cents for crepe, and 25 cents for dyeing. There are a great many invoices in evidence bearing the notations "dyed and sold" and such price per yard. Continuing his explanation, Katz testified that he found "men on the street" who had fabrics for sale; that he took them to manufacturers who agreed to buy the materials; and that they were delivered to Modern to be dyed by Modern, if the pieces of goods to be dyed were not too large for Modern's equipment, or to be dyed by others selected by Modern, if the pieces to be dyed were large. Modern would send the invoices to the manufacturers who had purchased the goods; they would send their checks to Modern; Katz would cash the checks at either *194 one of the check cashing concerns where his credentials were on file; and he would use the proceeds to pay the amount due to the unnamed vendor of the fabrics, and pay any dyeing charges due to other dyeing establishments. In many instances, an amount would be due Modern for dyeing charges. Katz denied that he or Modern bought and resold any fabrics; he denied that he used the fictitious names Stern and Linder, and he denied that he or Modern realized any substantial income, or retained any substantial amount, from the entire proceeds of checks in the total amount of $84,131.54. Katz stated that the "men on the street," whom he located, all adopted the name of either Stern or Linder; that they paid a small commission of not more than 5 per cent for Modern's middleman services; and that they sometimes paid a bonus of $25 or $50 for the accommodation of having the checks cashed at the check cashing agencies. We are not wholly satisfied with all of Katz's explanation, although the pattern of the arrangements is corroborated by paid invoices produced by respondent, the testimony of witnesses called by respondent, and the records of the two check cashing concerns. For example: Katz could *195 not supply the name of a single individual who produced fabrics, and petitioners produced none to testify in corroboration. Out of over 100 cancelled checks of Modern, and out of a great many paid invoices marked "dyed and sold," which were produced by respondent, only a small number of checks were made payable to either Stern or Linder, and only a few invoices were made out in either name, and all invoices which were made out in a fictitious name bore the address of Modern, designating the address, "care of", Modern. Respondent called some of the employees of the customers of Modern whose checks were made payable to Stern, or Linder, or Modern in payment of "dyed and sold" invoices. These witnesses testified that they dealt chiefly with Katz, and on occasion with Dickstein. They could recall no J. Linder, Jack Linder, or Joseph Stern. It was their policy to buy from either Dickstein or Katz, and then draw a check for the purchase in accordance with the heading on the invoice which they received. Morris Seifer, a piece goods man who was employed by Harry Frechtel & Co. during 1944, executed a written statement under oath before a special agent of the Commissioner in which he stated, *196 in part, as follows: "That in order to get goods which were scarce at the time, I approached Julius Katz of Modern Piece Dye Works and asked him if he could get it for me. "That Julius Katz got these goods for me and billed me under the name of Jack Linder. "I do not know nor have I ever seen Jack Linder. "That the checks in payment for these goods were made out in the name of Jack Linder, the same name appearing on the invoice, and sent to Modern Piece Dye Works. "That Julius Katz handled the entire transaction." The record contains more than 800 paid invoices of Modern dated in 1944, which respondent obtained from a great many of Modern's customers. These invoices fall into two classes, those which do not have the notation, "dyed and sold," and those which are so marked. There are enough pairs of "dyed and sold" invoices and of the customer's checks given in payment thereof, which checks bear clearing house stamps identifying them as having been cashed at one or the other of the check cashing concerns, to constitute clear proof that it was petitioners' practice in 1944 to cash the checks given in payment of the "dyed and sold" invoices issued in the name of Modern at a check cashing *197 concern rather than to deposit such checks in Modern's bank account. Such evidence and the records of the two check cashing agencies establish that Modern had a substantial amount of gross receipts during 1944 which became available to Modern through the use of non-commercial, private banking facilities and, therefore, the receipt of such funds was concealed. The number and the total amount of checks of customers of Modern payable to Stern or Linder (and of invoices under such names) is comparatively small compared to the amount of checks of customers of Modern which were made payable to Modern, as shown by the books of the check cashing concerns, the latter amounting to $65,835.60, and the former amounting to $18,295.94. Therefore, Katz's explanation that fictitious names were used, accounts for only a small part of the "dyed and sold" transactions, and respondent has proved that Modern was greatly involved in transactions which were not openly carried on, entirely apart from the transactions in the names of Stern and Linder. With respect to such transactions, the use of fictitious names was, in our opinion, a device followed by Modern and Katz for the purpose of covering up some *198 transactions, rather than a method adopted by alleged "men on the street." No other fictitious names were used in 1944 other than Stern and Linder. It is hardly credible that all of the alleged "men on the street" thought of those names only. We are unable to accept Dickstein's assertion that he was not aware of and did not know of this phase of Modern's transactions. There is testimony of employees of Modern's usual customers that in this sort of dealing they, at times, dealt with Dickstein. Also, Dickstein was present at a conference with respondent's agents held on September 8, 1950, where Katz admitted that merchandise had been sold in fictitious names. At no time during the investigation did Dickstein disclaim knowledge of these transactions. Upon the entire record, we are unable to believe that Dickstein was ignorant of them. His reliance upon , is, therefore, misplaced and of no avail. In the partnership return of Modern for 1944, petitioners reported gross receipts of $78,910.56. Respondent by his circularization of a great many, but not all, of Modern's customers obtained information by which he verified transactions in 1944 in the *199 total amount of $95,896.35, which were carried out in the name of Modern, and transactions carried out in the names of Stern and Linder in the total amount of $14,340.69, a grand total of $110,237.04, which is substantially in excess of the gross receipts reported for 1944. The Commissioner satisfied his burden of proof when he established that petitioners received more income than was reported. , certiorari denied, . Petitioners argue that the checks in question might have been received in 1944 in payment of sales made in the prior year, and that since Modern was on accrual basis, the proceeds were not recorded in 1944 when they were received, or reported in the 1944 return. However, the evidence establishes that it is the industry's custom to pay its bills by the first of the month following the month in which the bill is received. A cash payment practice is followed. This is established by exhibits containing the invoices and checks representing payment thereof. The evidence does not support the contention of the petitioners. Furthermore, the checks and invoices in question were dated 1944. We find and hold that petitioners *200 filed false and fraudulent returns for 1944 for themselves and for their partnership. Respondent's evidence amply fulfills his burden of proof, and assessment and collection of tax and additions for 1944 are not barred. In arriving at this conclusion, we have reviewed, considered, checked, and analyzed all of the record, including the voluminous collection of respondent's more than 100 exhibits. Also, we have given attention to the principle that fraud is never to be presumed but must be proved by clear and convincing evidence, and that the intent to evade tax is a specific intent. Direct evidence of the specific intent is seldom available to prove fraud, and whether it exists must be determined from the surrounding circumstances, including the conduct of the taxpayer. . As is set forth hereinafter, it is our conclusion that petitioners, as partners in Modern, realized for 1944 an amount of income, which is substantial, which they failed to report. Respondent's evidence establishes large discrepancies between the total income realized and what was reported; between what was done openly and what was done in a concealed way. Concealed transactions were carried *201 out on a large scale. Private, non-commercial banking facilities and fictitious names were used which are evidence of intent to conceal income and evade tax. Accounting records were lost or destroyed, or, at any rate, were not available to explain the evident discrepancies. Petitioners, especially Katz, could not state any amount as the amount of alleged 5 per cent commissions and of alleged bonuses for getting checks cashed. Petitioners have not given an adequate explanation of discrepancies between (on the one hand) their expenditures and undeposited receipts from checks cashed at check cashing agencies, and (on the other hand) the amounts of income which they reported. The circumstances and the conduct of the petitioners, considered in the light of the entire record, compel the conclusion that petitioners filed false and fraudulent returns for 1944, and that part of each deficiency for 1944 is due to fraud with intent to evade tax. ; ; , certiorari denied ; ; , affd. ; *202 , affd. . Petitioners contend that they are entitled to "costs of goods sold," in addition to such costs as were reported in the partnership return in the amount of $39,175.57, in the event it is held that the year 1944 is not closed by the bar of the statute of limitations and that they realized income which they failed to report. Petitioners appear to ask for additional costs of goods sold in the entire amount of the income which respondent determined was not reported, $85,117.28; they do not suggest some other amount. The petitioners have the burden of showing what errors exist in the respondent's determination that the partnership's taxable net income exceeded what they reported to the extent of $85,117.28. Specifically, the petitioners must show what their costs of "goods sold" were, and whether all of them were deducted in the partnership return. Once fraud is established, the statute of limitations does not apply and petitioners must show that the determination of deficiency is incorrect. ; ; ; United States v. Fenwick, 117 *203 [177] Fed. (2d) 488; , certiorari denied, . Modern was not a manufacturer of fabrics. All transactions, in which the prices charged included the prices of fabrics, involved costs. Either Modern bought materials and resold them, or Modern acted as a middleman, and some other vendor of materials was paid out of the gross proceeds which Modern received. It is conceivable that both kinds of transactions took place. Therefore, whether or not Katz's explanation is entirely credible and worthy of belief, costs were involved. "A taxpayer's costs and other factors which would lessen his tax liability are peculiarly within his own knowledge * * *. * * * the Government, having shown unreported income is aided by the presumption that the deductions and exclusions listed by a taxpayer in his return are all that exist." . In , the following was stated: "The figures of cost of goods sold, as they were used in preparing his tax returns, were at least admissions by the defendant which the government could utilize in making a prima facie case. The defendant was *204 chargeable with them until he offered credible evidence to show that the figures were in error, and that his costs were greater." Petitioners have not submitted any figures, records, or explanations of what costs are represented by the sum of $39,175.57 taken in the return as "cost of goods sold" during 1944. On the other hand, there is testimony of Katz that the ordinary and customary charges of Modern for dyeing piece goods ranged from 15 to 25 cents a yard, and that in the "dyed and sold" transactions, the invoice prices included the selling prices of yardage materials at from 50 cents to 60 cents a yard, and this testimony is corroborated by the paid invoices which are part of the record. Another cost, or expense, was the fee paid to the check cashing agencies for cashing checks. In the absence of proof of the exact amount of that expense, we find that it was not more than $1,261.97, for checks cashed in the total amount of $84,131.54. Since costs were involved in transactions involving sales of fabrics, since the partnership's gross receipts amounted to $163,042.10 (gross receipts reported plus checks of $84,131.54), and since $39,175.57 (costs reported in the return) is a rather *205 small percentage of the gross receipts, we have endeavored to determine what additional amount of costs, if any, should be allowed, bearing heavily against petitioners because of their own inexactitude. . The cost of goods purchased for resale, with proper adjustment for opening and closing inventories, is deducted from gross sales in computing gross profit. Regulations 111, sec. 29.23(a)-1. It is concluded that to costs reported in the return, $39,175.57, there should be added costs of cashing checks, $1,261.97, and $25,000, which we find to be additional cost of goods sold, so that total "cost of goods" sold is $65,437.54. We find and hold, therefore, that the gross profit for 1944 of the partnership, Modern, was $97,604.56, and its taxable net income (after other expenses not in issue in the amount of $31,013.75) was $66,590.81. It follows that Modern's income for 1944 was not reported to the extent of $57,869.57. To this extent, the respondent's determinations of the amounts of the unreported income of Modern and of the petitioners are sustained. Decisions will be entered under Rule 50. Footnotes
1. Counsel for petitioner, Frank Dickstein. Petitioner, Julius Katz, was not represented by anyone other than himself. No brief was filed by him or in his behalf. A brief was filed for the petitioner, Frank Dickstein, only.↩
*. Correct figure. Error of $3 is found in addition in respondent's exhibit RR. ↩
**. Correct figure. Respondent's figure of $17,678.53 is wrong.↩
2. Respondent, in his brief, requests the Court to find that Modern received or accrued $6,233.67, in 1944, in checks made in the name of Linder. Checks are in evidence made in the name of Linder which total that amount. Respondent, in his brief, requests the Court to find that Modern received or accrued in 1944, $8,107.02 in checks made in the name of Stern. Respondent's grand total for checks in the names of Linder and Stern is $14,340.69. There are checks in evidence made payable to Stern in the total amount of $8,350.81. The Court's finding of fact is, therefore, that the grand total of cancelled checks in evidence in the names of Stern and Linder is $14,584.48.
3. Respondent's brief states that the total amount is $83,976.49. The Court finds from the evidence adduced that respondent's figure is too low to the extent of $155.05, and that the correct total is $84,131.54. The error is found in the addition of checks made payable to Modern.
4. The details of how the Commissioner computed the amount, $164,027.84, are set forth in his agent's report, a copy of which was sent to petitioners. However, that report is not in the record before us. It is stated in the brief filed for Dickstein that the above figure is the result of adding alleged unreported receipts in the amount of $85,117.28 to gross receipts reported in the partnership return, $78,910.56, which results in a total of $164,027.84.